**FIRST CAPITAL ASSET MANAGEMENT, INC.,**
et ano., Plaintiffs,

v.

**BRICKELLBUSH, INC.,**
et al., Defendants.

**No. 00 CIV.5597 LAK.**

United States District Court,
S.D. New York.

Sept. 11, 2002.

Eric W. Berry, Eric W. Berry Law Office PC, New York City, for Plaintiffs.

Russell P. McRory, McRory and McRory, P.L.L.C., Garden City, NY, for Defendants Satinwood, Inc., Sphinx Rock, N.V., Ahmed Vahabzadeh, Afsar Vahabzadeh, Savco, S.A., and The Estate of Soleyman Vahabzadeh.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiffs and certain defendants seek reconsideration of different aspects of the Court's July 29, 2002 opinion (the "July 29 Opinion"), familiarity with which is presumed, which granted in part and denied in part defendants' motion to dismiss the amended complaint.[1] Most of the points they raise lack any color of merit and are simply efforts to replow ground adequately

1. *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.,* 218 F.Supp.2d 369 (S.D.N.Y.2002) ("*FCAM II* ").

cultivated before. Certain arguments, however, require further discussion. Upon reconsideration of these limited matters, the Court adheres to its prior ruling on the standing/ripeness issue challenged by the plaintiffs,[2] but is persuaded that it should have considered the moving defendants' Rule 12(b)(6) and 9(b) arguments.

## I. Lost Debt Injury

Plaintiffs contend that the Court erred in ruling that they lack standing under RICO to recover their alleged "lost debt" as a result of its failure to recognize that *GICC Capital Corp. v. Technology Finance Group, Inc.*[3] permits such a claim in these circumstances and, indeed, modified or overruled *Bankers Trust Co. v. Rhoades*[4] and *Stochastic Decisions, Inc. v. DiDomenico*[5] to the extent that they pointed to the opposite result.

The Court has reconsidered those cases carefully and, to the extent that it suggested in a footnote in the July 29 Opinion that the *GICC* panel had misread *Bankers Trust* and *Stochastic*,[6] has concluded that it was mistaken. The Court nevertheless reaches the same result.

The Court indicated in its prior opinion that *Bankers Trust* and *Stochastic* stand for the proposition that a creditor claiming that its ability to collect its debt has been impaired or frustrated by a RICO violation lacks standing to sue under RICO for the amount of the debt as long as the extent of the loss remains uncertain, as for example where collection efforts continue.[7] To be more precise, these cases go to the ripeness of such a plaintiff's RICO claim, but ripeness and standing are intertwined because a plaintiff does not acquire standing by virtue of a claim that is not ripe.[8] Plaintiffs previously argued, and argue again, that *GICC* held that the pendency of state law fraudulent conveyance claims does not preclude maintenance by the plaintiff of a RICO action to recover the lost debt, seizing on a statement in that opinion that "[t]he possibility of a state court action, however, does not preclude [the plaintiffs'] standing to pursue federal claims in federal court."[9] As the Court previously observed, however, the quoted statement, taken in context, does not support the argument plaintiffs now base on it.

The complaint in *GICC* alleged that the defendants had looted Technology Finance Group, Inc. ("TFG") in order to frustrate GICC Capital Corporation's ability to collect a debt owed to it by TFG and contained various state law claims as well as a RICO count. The district court dismissed the RICO claim on the ground that "the looting of TFG proximately caused harm only to TFG and not to Capital, and that Capital therefore lacks RICO standing."[10] On appeal, GICC argued that it had standing to sue under RICO, "even though it

---

**2.** *See* Pl. Mem. Recon. 1–10.

**3.** 30 F.3d 289 (2d Cir.1994), *cert. denied*, 518 U.S. 1017, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996).

**4.** 859 F.2d 1096 (2d Cir.1988), *cert. denied sub nom. Soifer v. Bankers Trust Co.*, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

**5.** 995 F.2d 1158 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993).

**6.** *FCAM II*, 218 F.Supp.2d at 381–82 n. 32.

**7.** *Id.* at ——, 2002 WL 1751268 *3.

**8.** *See, e.g., First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir.1994) (indicating that plaintiff's RICO claims were not ripe and thus it did not yet have standing under RICO), *cert. denied*, 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995).

**9.** *GICC Capital Corp.*, 30 F.3d at 293.

**10.** *Id.* at 290.

[was] a creditor," and that this conclusion was supported by *Bankers Trust* and *Stochastic.*[11] The defendants, for their part, maintained that the magistrate and district judges had concluded correctly that GICC lacked standing because, as a creditor, its injury from the alleged looting of the TFG was indirect.[12] Additionally, in a brief, three-sentence passage, they argued that the case was simply a collection action, that it belonged in state court, and that it was a sort of suit that *Bankers Trust* and *Stochastic* were designed to prevent.[13] And the Second Circuit's only reference to the question in *GICC,* quoted in full, was:

> "Defendants contend that the appropriate remedy for a general unsecured creditor like Capital is a state court action. They surmise that Capital is in federal court only because of RICO's treble damages provision. The possibility of a state court action, however, does not preclude Capital's standing to pursue federal claims in federal court."[14]

Taken in full and in context, this statement simply did not modify or overrule those portions of *Bankers Trust* and *Stochastic* dealing with the ripeness of lost debt injury.

To begin with, the appellate arguments to which this statement responded had nothing to do with the ripeness of the RICO claim, the issue here. The defendants' point was that the suit was a collection case that belonged in state court and, in substance, that it was an abuse of the RICO statute. The Circuit's statement that the possibility of a suit in state court did not foreclose a RICO action thus was not intended to suggest that GICC's RICO claim was ripe even if GICC still might have collected the allegedly lost debt by other means—that issue was not before the Court.[15] It simply invoked the uncontroversial proposition that the availability of a RICO or, for that matter, a securities, antitrust or other claim based on a federal statute, ordinarily does not require exhaustion of state remedies.

Further, if the panel had intended its comment as plaintiffs now contend, it would have been inconsistent with or, at least, in significant tension with the prior decisions by other panels in *Bankers Trust* and *Stochastic.* The fact that the *GICC* panel did not suggest that it was overruling or modifying those cases, or even indicate that it was addressing the issue that plaintiffs now claim it decided, convincingly confirms that plaintiffs have misread the decision.

■ In sum, the Court adheres to its prior ruling that plaintiffs' alleged lost debt injury does not provide them with RICO standing because their ongoing col-

---

11. Brief of Plaintiff–Appellant GICC Capital Corp., at 2–3, 20–33, *GICC Capital Corp. v. Technology Fin. Group, Inc.,* 30 F.3d 289 (2d Cir.1994) ("Appellant's Brief").

12. Brief of Defendants–Appellees Technology Finance Group, Inc., et al., at 5–12, *GICC Capital Corp. v. Technology Fin. Group,Inc.,* 30 F.3d 289 (2d Cir.1994) ("Appellees' Brief I"); Brief of Appellees Andrew Graham et al., at 7–12, *GICC Capital Corp. v. Technology Fin. Group, Inc.,* 30 F.3d 289 (2d Cir.1994) ("Appellees' Brief II"); *see also* Reply Brief of Plaintiff–Appellant GICC Capital Corp., at 2, *GICC Capital Corp. v. Technology Fin. Group, Inc.,* 30 F.3d 289 (2d Cir.1994) ("Reply Brief") ("The core of Defendants' position on this appeal is that, if GICC has alleged a valid RICO claim, it nevertheless lacks standing to assert it, because it is a creditor of TFG."); *id.* at 2–6.

13. Appellees' Brief I, at 12.

14. 30 F.3d at 293.

15. To be sure, it appears from the panel's description of the facts that the point might have been raised in that case. A full examination of the appellate briefs, however, revealed that neither party made any argument whatsoever regarding the ripeness of lost debt injury.

lection efforts render the extent of the loss uncertain.[16]

## II. Rule 9(b) and 12(b)(6) Arguments

On their motion to dismiss the amended complaint, the moving defendants argued that certain predicate acts were not pleaded with particularity and that the amended complaint failed adequately to allege a pattern of racketeering activity by either Sohrab or Afsar, requiring dismissal of plaintiffs' claims under 18 U.S.C. § 1962(c) and (d). In the July 29 Opinion, the Court declined to address these arguments because they revolved exclusively around plaintiffs' RICO claims, "all of the RICO claims against the moving defendants ha[d] been dismissed," and the arguments, in its view, therefore were moot.[17]

It is well settled that federal courts have no power "to decide questions that cannot affect the rights of litigants in the case before them"[18] or " 'to give opinions upon moot questions or abstract propositions.' "[19] Defendants argue that the Court incorrectly concluded that determi-

nation of these issues could not affect the rights of any of the moving defendants. The Court agrees because a number of the moving defendants now are faced with the task of defending state law claims in federal court solely by virtue of the continued pendency of the RICO claims against Sohrab.[20] In other words, resolution of the RICO claims against Afsar and Sohrab would enable the Court to determine whether the remaining moving defendants are entitled to dismissal of the state law claims against them for lack of subject matter jurisdiction.[21]

Moreover, while dismissing a complaint as to a non-moving defendant is not an ordinary practice,[22] a district court may dismiss claims *sua sponte* for failure to state a claim, at least so long as the plaintiff had notice and an opportunity to be heard on the issue.[23] Here, both parties devoted a significant portion of their papers to the Rule 9(b) and 12(b)(6) arguments, apparently assuming that the Court would adjudicate these questions despite Sohrab's failure to move for dismissal. In

---

**16.** The Court is not persuaded by plaintiffs' argument that dismissal of Count IV conclusively establishes that their collection efforts have been frustrated. *See* Pl. Mem. Recon. 8–11. Count IV was dismissed for lack of personal jurisdiction and failure to serve, *see id.* at 9, and not on the merits.

**17.** *FCAM II*, 218 F.Supp.2d at 403.

**18.** *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (per curiam).

**19.** *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (*quoting Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895)).

**20.** Am. Cpt. ¶ 20. There is no complete diversity because plaintiff First Capital Asset Management, Inc. and defendant Satinwood, Inc. are both Delaware corporations. *See id.* ¶¶ 1, 3.

**21.** The notice of motion indicated that the moving defendants were seeking an order, *inter alia*, "dismissing all claims pursuant to Rule 12(b)(1) for lack of standing and subject matter jurisdiction."

**22.** *Ohio Cas. Ins. Co. v. Mohan*, 350 F.2d 54, 57 (3d Cir.1965); *Sell v. Price*, 527 F.Supp. 114, 117–18 (S.D.Ohio 1981).

**23.** *See, e.g., Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir.1994); *Perez v. Ortiz*, 849 F.2d 793, 797 (2d Cir.1988); *Leonhard v. United States*, 633 F.2d 599, 609 n. 11 (2d Cir.1980), *cert. denied*, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1357, at 301 (1990) ("Even if a party does not make a formal motion, the court on its own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair.").

short, plaintiffs had ample notice and availed themselves of the opportunity to litigate the sufficiency of the claims against Sohrab under Section 1962(c) and (d).[24]

In sum, the Court will consider defendants' arguments that all of the RICO claims should be dismissed for failure to plead fraud with particularity or to state a claim upon which relief can be granted because it is persuaded that substantial rights of the moving defendants turn on these issues.

### A. Particularity

Defendants argue that the amended complaint's allegations regarding Sohrab's alleged transfer of his interests in the Timberland and Tiburon partnerships to Ahmed in August 1995 do not satisfy Rule 9(b)'s heightened pleading requirements. Plaintiffs contend that this transaction amounted to an act of bankruptcy fraud on the part of Sohrab in violation of 18 U.S.C. § 152(7), which makes it unlawful for any person, in contemplation of his or her bankruptcy, to transfer or conceal knowingly and fraudulently his or her property.[25] As noted in the July 29 Opinion, Rule 9(b) applies to allegations of bankruptcy fraud.[26]

Rule 9(b) requires that the circumstances of fraud be alleged with particularity. This requires reasonable detail as well as the allegation of facts from which a strong inference of fraud reasonably may be drawn.[27] Moreover, allegations made on information and belief are insufficient " 'unless the facts are peculiarly within the knowledge of the defendants, in which case the complaint must allege facts demonstrating the basis for the information and belief.' "[28] The requisite "strong inference" of fraud may be established by alleging facts either (a) showing that defendants had both motive and opportunity to commit fraud, or (b) constituting strong circumstantial evidence of conscious misbehavior or recklessness.[29]

In *FCAM I*, the Court concluded that the original complaint did not satisfy Rule 9(b) with respect to the August 1995 transfer because (1) there was only a conclusory allegation that the transfer was made "in contemplation of bankruptcy," (2) the transfer predated Sohrab's bankruptcy filing by two years and occurred before judgments were entered against him and his companies, (3) the plaintiffs alleged elsewhere in the complaint that the RICO pattern lasted from January 1997 through November 13, 1999, which postdated the transfer and (4) other allegations that Sohrab made fraudulent conveyances in the same time period did not allege that he made them in contemplation of bankruptcy.[30]

Plaintiffs attempted to address these deficiencies by alleging in the amended complaint that (a) Sohrab's wife, Ninni, revealed in a tape-recorded conversation on July 25, 1996 that one of Sohrab's compa-

**24.** Plaintiffs fully addressed also the sufficiency of the claims against Afsar under Section 1962(c) and (d).

**25.** *United States v. Sabbeth,* 262 F.3d 207, 212–13 (2d Cir.2001).

**26.** *FCAM II,* 218 F.Supp.2d at 385; *see, e.g., First Capital Asset Mgmt., Inc. v. Brickelbush, Inc.,* 150 F.Supp.2d 624, 632–33 (S.D.N.Y. 2001) (*"FCAM I "*); *Browne v. Abdelhak,* No. Civ. A. 98–6688, 2000 WL 1201889, at *8

(E.D.Pa. Aug.23, 2000); *In re Sattler's, Inc.,* 73 B.R. 780, 787 n. 7 (Bankr.S.D.N.Y.1987).

**27.** *Nat'l Council of Young Israel v. Wolf,* 963 F.Supp. 276, 281 (S.D.N.Y.1997).

**28.** *Id.* (quoting *Spira v. Nick,* 876 F.Supp. 553, 557 (S.D.N.Y.1995)).

**29.** *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).

**30.** *FCAM I,* 150 F.Supp.2d at 632.

nies would file for bankruptcy and that "Sohrab might file for bankruptcy" if First Capital was successful in its state court action;[31] (b) Sohrab "was . . . considering filing for bankruptcy" at the time he transferred approximately $360,000 to Soleyman in August 1995;[32] and (c) in an amended counterclaim that Sohrab filed in the state court action on October 24, 1995, he revealed that he sold the Timberland and Tiburon interests because of First Capital's lawsuit and liquidated these interests for less than fair value.[33]

The first two changes clearly are not sufficient to give rise to a strong inference that Sohrab made the Timberland and Tiburon transfer in contemplation of bankruptcy. The conclusory allegation regarding Sohrab's mental state at the time of the contemporaneous transfer to Soleyman is unsupported by any concrete factual allegations. Ninni's conversation postdated the transfer by almost a year and, if anything, dispels any inference that Sohrab was contemplating bankruptcy in August 1995, as discussed more fully below.

■ The allegation regarding Sohrab's counterclaim requires more discussion because it gives rise to the inference that Sohrab made the August 1995 transfer to place assets beyond the reach of plaintiffs, his potential judgment creditors. This inference, however, is not sufficient. In order to make out a violation of 18 U.S.C. § 152(7), which is the alleged predicate

act, plaintiffs must allege specific facts demonstrating that Sohrab made the transfer *in contemplation of bankruptcy or otherwise with an intent to defraud a United State bankruptcy court or defeat the bankruptcy laws.*[34] An intention to engage in a transfer for the purpose of hindering potential creditors does not alone arise to the level of bankruptcy fraud.[35]

Here, the August 1995 transfer took place almost two years before Sohrab entered bankruptcy, cutting strongly against any inference that he was contemplating bankruptcy at this early juncture. Moreover, plaintiffs' own factual allegations undercut any inference that Sohrab had bankruptcy in mind when he made the August 1995 transfer. They allege that Ninni revealed in a tape-recorded conversation on July 25, 1996 that "Sohrab *might* file for bankruptcy if FCAM was successful in the *First Capital v. North American* action."[36] This suggests that Sohrab still did not have a firm intention to file for bankruptcy almost a year after the transfer—it was contingent upon First Capital's future victory in the lawsuit, and, according to plaintiffs' allegation, even in that case it would not be inevitable. Furthermore, plaintiffs continue to allege elsewhere in the amended complaint that the RICO pattern commenced in 1997, two years after this transaction, contradicting their assertion that the August 1995 trans-

---

31. Am. Cpt. ¶ 57.

32. *Id.* ¶ 103.

33. *Id.* ¶¶ 74, 89.

34. *See United States v. West,* 22 F.3d 586, 590 (5th Cir.), *cert. denied,* 513 U.S. 1020, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994); *United States v. Tashjian,* 660 F.2d 829, 842 (1st Cir.1981), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981); *Burke v. Dowling,* 944 F.Supp. 1036, 1065–66 (E.D.N.Y.1995).

35. *See, e.g., Burke,* 944 F.Supp. at 1066 (holding that plaintiffs failed to plead bankruptcy fraud with particularity when they alleged that they were "incurring obligations that they knew they could not meet," but failed to allege "that any defendant *ever gave any thought to the prospect of filing for bankruptcy in a U.S. court.*" (emphasis added)).

36. Am. Cpt. ¶ 57 (emphasis added).

fer was an act of bankruptcy fraud and part of the alleged RICO pattern.[37] In all the circumstances, especially given the amount time that elapsed between the transfer and Sohrab's filing, plaintiffs' allegations do not go far enough to give rise to an inference that he made the August 1995 transfer in contemplation of bankruptcy or otherwise with an intent to defeat the United States bankruptcy laws.

In short, plaintiffs' conclusory allegations of *scienter* without a coherent factual basis are insufficient to meet Rule 9(b)'s requirements.. The August 1995 transfer therefore cannot be considered in evaluating Sohrab's pattern of racketeering activity.[38]

## B.  Pattern of Racketeering Activity

The RICO statute provides that a "pattern of racketeering activity" must consist of "at least two acts of racketeering activity" undertaken within ten years.[39] The Supreme Court has elaborated on this requirement, holding that the acts must be "related" and "amount to or pose a threat

of continued criminal activity."[40] The required continuity may be either "open-ended" or "closed-ended."[41] Plaintiffs apparently allege open- and closed-ended continuity in the alternative, stating at various points in the amended complaint that the series of acts spanned a finite time of either three or four years and indicating elsewhere that defendants' "conduct is currently ongoing and recurring" and that defendants continue to hide Sohrab's assets from his creditors.[42]

### 1.   Open-ended Continuity

To establish open-ended continuity, plaintiffs ultimately must show a threat of continuing criminal activity.[43] To determine whether conduct poses such a threat, courts have looked in part to the nature of an enterprise's business, holding that the acts of an enterprise that exists for criminal purposes almost certainly threaten repetition.[44] When, as is the case here, the enterprise "primarily conducts a legitimate business, there must be some evidence from which it may be inferred that

37.  *Id.* ¶ 19.  Indeed, plaintiffs continue to make 1997 the start of the alleged RICO pattern in their latest filing.  Pl. Mem. Opp. Recon.  4 (Sept. 6, 2002).

38.  *See, e.g., FCAM I,* 150 F.Supp.2d at 633 (citing *GICC Capital Corp. v. Technology Fin. Group, Inc.,* 67 F.3d 463, 467 (2d Cir.1995) (*"GICC Capital Corp. II "*), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996)).  The Court held in the July 29 opinion that the allegations regarding Sohrab's transfer of his alleged inheritance to Afsar and her subsequents transfers back to him failed for lack of particularity.  *See FCAM II,* 218 F.Supp.2d at 385.  These allegations therefore cannot be considered in evaluating the pattern of racketeering activity either.

39.  18 U.S.C. § 1961(5).

40.  *H.J. Inc. v. N.W. Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).  The Court is not persuaded by defen-

dants' argument, for which they cite no authority, that each predicate act must have proximately caused injury to plaintiffs in order for it to be considered in evaluating the pattern of racketeering activity.  *Cf. Beck v. Prupis,* 529 U.S. 494, 505–06 & n. 10, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) (in RICO conspiracy context, injury must flow from at least one predicate act).

41.  *Id.* at 241.

42.  *See, e.g.,* Am. Cpt. ¶¶ 19, 146.

43.  *See De Falco v. Bernas,* 244 F.3d 286, 323 (2d Cir.) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 242 (2d Cir.1999)), *cert denied sub nom.  Dirie v. De Falco,* —— U.S. ——, 122 S.Ct. 207, 151 L.Ed.2d 147 (2001).

44.  *H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. 2893; *United States v. Aulicino,* 44 F.3d 1102, 1111 (2d Cir.1995).

the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." [45]

In *FCAM I*, after dispensing with the notion that the nature of the enterprise created a threat of continued criminal conduct, the Court determined that the alleged scheme was "inherently terminable" [46] because all of the facts alleged revolved around a bankruptcy. It reasoned that the scheme to avoid payment to creditors "necessarily ended with the bankruptcy to which it related." [47] Plaintiffs now allege that the bankruptcy case is still open and that the defendants continue actively to hide and conceal Sohrab's assets from his creditors. [48] Records on the bankruptcy court's electronic filing system, of which the Court takes judicial notice in this Rule 12(b)(6) portion of the motion, [49] confirm that the bankruptcy case is still pending. Thus, it appears that the question of open-ended continuity no longer may be dispensed with so easily.

### a. *Afsar*

The nature and circumstances of the properly pled predicate acts allegedly committed by Afsar do not suggest a threat of continued criminal activity. All allegedly were committed between March and September 1998, solely in connection with the *First Capital v. Vahabzadeh* adversary proceeding. [50] They consisted of acts of mail fraud and misrepresentations to the bankruptcy court, purportedly designed to stonewall plaintiffs' discovery efforts. Nothing in these circumstances suggests any threat of continued criminal conduct, especially because the adversary proceeding concluded in December 1999. Thus, in a sense, Afsar's alleged predicate acts themselves were inherently terminable, notwithstanding the continuation of the larger bankruptcy case.

### b. *Sohrab*

Nor do the nature and circumstances of the properly pled predicate acts allegedly committed by Sohrab suggest a threat of continued criminal activity. The alleged acts consist of a handful of transfers in contemplation of bankruptcy in a four-month period immediately prior to the filing of his petition on July 17, 1997, [51] the filing of a materially false bankruptcy petition, [52] perjuring himself at a September 4, 1997 meeting of his creditors [53] and a Bankruptcy Rule 2004 examination on September 16, 1997, [54] submitting a false affidavit regarding certain trust property on June 25, 1998, during the course of discovery in the *First Capital v. Vahabzadeh* adversary proceeding, [55] and perjuring himself at trial in the adversary proceeding in October 1999. [56]

---

45. *See De Falco*, 244 F.3d at 323 (quoting *Cofacredit*, 187 F.3d at 243); *see also GICC Capital Corp. II*, 67 F.3d at 466 (courts look, *inter alia*, at nature of the predicate acts to determine threat of continued criminal conduct).

46. *See, e.g., Cofacredit*, 187 F.3d at 244; *GICC Capital Corp. II*, 67 F.3d at 466.

47. *FCAM I*, 150 F.Supp.2d at 634.

48. Am. Cpt. ¶ 146.

49. *See* 2 MOORE'S FEDERAL PRACTICE § 12.34[2], at 12–68.1 to 12–69 (3d ed.2000).

50. *See* Am. Cpt. ¶¶ 150–54.

51. *See id.* ¶ 162(a)-(g).

52. *See id.* ¶¶ 147(c), 162(i).

53. *See id.* ¶ 147(d).

54. *See id.* ¶ 147(e), (f), (g).

55. *See id.* ¶ 147(h)(ii).

56. *See id.* ¶ 147(h)(iii).

Several observations are warranted. First, there is no properly pled predicate act alleged to have occurred in the past three years, which cuts against a finding of a current or future threat. Second, while it arguably is true that one who shifts his money around to avoid creditors is likely to continue to do so long as they pursue him, the crux of plaintiffs' allegations is that Sohrab has no assets left with which to repay them, and consequently no assets left to transfer in violation of the bankruptcy laws. The chronology of alleged predicate acts suggests that, prior to bankruptcy, Sohrab did what he could to move his assets out of the reach of his creditors and then attempted to cover up the transfers in his bankruptcy proceeding. But that stopped after the adversary proceeding, when plaintiffs contend his frauds were revealed,[57] and there is no concrete reason to suppose he will engage in further bankruptcy frauds. Plaintiffs' conclusory assertion that Sohrab and other defendants "continue to actively hide and conceal Sohrab's assets from his creditors and the Chapter 7 Trustee"[58] lacks any specific and concrete factual basis. The circumstances and nature of the properly pled predicate acts therefore do not suggest a threat of future criminal conduct.

### 2. Closed-ended Continuity

Closed-ended continuity is established by "a series of related predicates extending over a substantial period of time."[59]

Although not endorsing a "bright line test for determining precisely what period of time is 'substantial,'"[60] courts have pointed repeatedly to duration as the most important factor in whether a closed-ended RICO pattern exists.[61]

Since the Supreme Court decided *H.J. Inc. v. Northwestern Bell Telephone Co.*,[62] this circuit has not held that a period of less than two years amounted to a period of time sufficiently substantial to make out a closed-ended pattern.[63] In *Jacobson v. Cooper*,[64] the court found closed-ended continuity where the predicate acts occurred over "a matter of years."[65] In *Metromedia Co. v. Fugazy*,[66] it held erroneous a jury instruction stating that a few weeks or months was an example of a period long enough to establish a pattern, although it concluded that the error was harmless because the acts alleged spanned approximately two years.[67] At least one "pattern" that extended over almost two years was sufficient to survive summary judgment, but only in the context of seventy predicate acts, some of which threatened continued criminal activity.[68]

While this circuit has not found acts spanning less than two years to be a closed-ended pattern, acts that occurred over longer periods do not automatically form a pattern. "[O]ther factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate

**57.** *See id.* ¶¶ 69, 70.

**58.** *Id.* ¶ 146.

**59.** *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893.

**60.** *Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir.1992), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).

**61.** *See, e.g., Cofacredit*, 187 F.3d at 242–43.

**62.** 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

**63.** *De Falco*, 244 F.3d at 321.

**64.** 882 F.2d 717 (2d Cir.1989).

**65.** *Id.* at 720.

**66.** 983 F.2d 350 (2d Cir.1992).

**67.** *Id.* at 369.

**68.** *Cosmos Forms Ltd. v. Guardian Life Ins. Co.*, 113 F.3d 308, 310 (2d Cir.1997).

schemes are also relevant in determining whether closed-ended continuity exists."[69] Multiple schemes are not required,[70] but their existence may lend support to a finding that defendants' activities were "neither isolated nor sporadic."[71]

### a. Afsar

■ As noted above, all of the properly pled predicate acts allegedly committed by Afsar occurred between March and September 1998. This short time period is insufficient to demonstrate closed-ended continuity,[72] regardless of the other factors, which in any case do not support plaintiffs' position.

### b. Sohrab

Since the Court addressed closed-ended continuity with respect to Sohrab in FCAM I, plaintiffs have alleged seven new predicate acts, all involving Sohrab's pre-petition transfers to and in conjunction with his wife, Ninni.[73] They consist of transfers of "marital cash assets" to Ninni's father and brother[74] and an entity called Sondabury Investments, Ltd.,[75] as well actions to vest certain property rights in Ninni rather than Sohrab,[76] all within three to four months of Sohrab's filing for bankruptcy. Plaintiffs contend that the addition of these acts provides closed-ended continuity where before it was lacking because they "do not involve his inheritance, his overseas wealth or his mother but, instead, his wife Ninni Ladjevardi, and her family, and therefore cannot be part of the same 'singular act' as the fraudulent conveyance of his inheritance."[77] The Court disagrees.

First of all, plaintiffs' focus on the "singular act" language from FCAM I is misguided. The Court cited Schlaifer Nance & Co. v. Estate of Andy Warhol[78] only for the simple proposition that closed-ended continuity does not follow automatically from alleged predicate acts spanning more than a two-year period.[79] Here, the first properly pled predicate act occurred on April 7, 1997, when Sohrab allegedly transferred "marital cash assets" to Ninni's father in contemplation of bankruptcy,[80] and the last occurred on October 25, 1999, when he allegedly made false statements at his bankruptcy trial.[81] That is, they extended over more than two and one-half years. As noted, however, that fact alone is not sufficient.

---

69. Cofacredit, 187 F.3d at 242; GICC Capital Corp. II, 67 F.3d at 467 (citing cases).

70. E.g., Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc., 879 F.2d 10, 16 (2d Cir. 1989), cert. denied, 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990).

71. GICC Capital Corp. II, 67 F.3d at 467 (quoting United States v. Indelicato, 865 F.2d 1370, 1383 (2d Cir.), cert. denied, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989)).

72. See, e.g., Cofacredit, 187 F.3d at 244; GICC Capital Corp. II, 67 F.3d at 467–68.

73. Am Cpt. ¶ 162(a)-(g). Plaintiffs alleged two further predicate acts that are duplicative of the previously alleged acts of filing a false petition and committing perjury at the adversary proceeding trial. See ¶ 162(h), (i).

74. Id. ¶ 162(a), (b), (d), (g).

75. Id. ¶ 162(c).

76. Id. ¶ 162(e), (f).

77. Pl. Mem. 10.

78. 119 F.3d 91 (2d Cir.1997).

79. FCAM I, 150 F.Supp.2d at 636.

80. Am. Cpt. ¶ 162(a). The Court does not consider the alleged transfer of Sohrab's inheritance to Afsar in "early 1997" because this allegation fails for lack of particularity. See supra note 38.

81. Am. Cpt. ¶ 147(h)(iii).

Second, the addition of these pre-petition transfers involving Ninni and her family does not change the previous conclusion that Sohrab allegedly took part only in a single scheme—to frustrate his creditors' collection efforts through fraudulent transfers and misrepresentations to the bankruptcy court. Plaintiffs' intimation that these predicate acts formed part of a separate scheme because they did not involve Sohrab's inheritance, his overseas wealth or his mother relies on an overly narrow characterization of the scheme at issue. Furthermore, while plaintiffs are correct that multiple schemes are not required in all circumstances, this "does not mean that the number and nature of the schemes alleged by a plaintiff in a given case are entirely irrelevant" because "a plaintiff must provide some basis for a court to conclude that [a] defendant['s] activities were neither isolated or sporadic." [82]

Third, plaintiffs' estimates regarding the number of acts committed by Sohrab are wildly inflated. They improperly count Sohrab's transfer of his inheritance and Afsar's subsequent transfers to him, neither of which have been alleged with particularity. They multiply the number of perjury predicate acts by splintering and parsing the subject matter of the alleged false statements at Sohrab's Rule 2004 examination. [83] In short, while there are more predicate acts alleged this time around, they still are relatively few in number.

Next, plaintiffs are correct that the number of victims is relevant in determining whether closed-ended continuity exists. [84] However, although they invoke the existence of fifteen additional creditors, they neither identify those creditors nor state the nature of their purported injuries. [85] Thus, this factor does not weigh significantly in their favor.

In the final analysis, viewing the allegations in the light most favorable to plaintiffs, they have alleged a pattern involving a single scheme of modest, if not narrow, scope consisting of approximately ten predicate acts. [86] In plaintiffs' favor, the predicate acts spanned well over two years. But the chronology of events suggests sporadic bursts of activity at key points in time, such as in the months immediately preceding and following Sohrab's bankruptcy petition and certain hot spots during the *First Capital v. Vahabzadeh* adversary proceeding, rather than sustained and continuous criminal activity over the whole time period. The Court is not prepared to conclude that the specific racketeering activities properly alleged here constitute the sort of "long-term criminal conduct" that Congress sought to target in RICO. [87]

Accordingly, the amended complaint fails to state a claim under Section 1962(c) against either Afsar or Sohrab because the alleged patterns of racketeering activity exhibits neither open-ended nor closed-

---

**82.** *GICC Capital Corp. II*, 67 F.3d at 467 (internal quotation marks omitted).

**83.** Pl. Mem. 13. In so doing, plaintiffs run afoul of the "singular act" language from *Schlaifer Nance. See* 119 F.3d at 98.

**84.** *See, e.g., De Falco*, 244 F.3d at 321.

**85.** *See, e.g., GICC Capital Corp. II*, 67 F.3d at 468 ("[P]laintiff does not identify any other victims, nor state in anything but general

terms the nature of their purported injuries.").

**86.** Plaintiffs themselves concede that a conservative estimate would be nine acts, although this estimate includes some of the flaws discussed above and fails to include four of the seven pre-petition transfers to Ninni and her family. *See* Pl. Mem. 13–14.

**87.** *See GICC Capital Corp. II*, 67 F.3d at 469.

ended continuity. Plaintiffs' Section 1962(c) claims are dismissed.[88]

## C. RICO Conspiracy

A claim under Section 1962(d) fails as a matter of law if the substantive claims based on the other subsections are defective.[89] There is no allegation that the defendants charged with RICO conspiracy agreed to perform additional predicate acts that, if committed, would have displayed continuity sufficient to satisfy a pattern of racketeering activity.[90] Recently, in *Beck v. Prupis*,[91] the Supreme Court expressly declined to "resolve whether a plaintiff suing under § 1964[ (d) ] for a RICO conspiracy must allege an actionable violation under §§ 1962(a)-(c), or whether it is sufficient for the plaintiff to allege an agreement to complete a substantive violation and the commission of at least one act of racketeering that caused him injury." [92] In the absence of contrary direction from the Supreme Court, the law of this circuit requiring actionable violations of Section 1962(a)-(c) in order to establish a conspiracy claim under Section 1962(d) controls.[93] Plaintiffs therefore fail to state a RICO conspiracy claim as well, and the Section 1962(d) claims are dismissed.

## III. Supplemental Jurisdiction

The alleged basis of subject matter jurisdiction over the fraudulent conveyance and veil piercing claims and over the defendants not named in the RICO counts is supplemental jurisdiction.[94] As the RICO claims have been dismissed, the Court is not obliged to exercise supplemental jurisdiction, and it declines to do so.[95]

## IV. Conclusion

For the foregoing reasons, plaintiffs' motion for reconsideration is granted. On reconsideration, however, the Court adheres to its prior ruling that plaintiffs' alleged lost debt injury does not provide them with RICO standing.[96] The defendants' motion for reconsideration also is granted. On reconsideration, the Court grants the defendants' motion to dismiss the amended complaint in its entirety.

SO ORDERED.

---

**88.** The Court dismisses the RICO claim against Sohrab *sua sponte*, despite his failure to move. *See supra* text accompanying notes 22–24.

**89.** *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir.1996), *vacated on other grounds*, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 113 F.Supp.2d 345, 385 (E.D.N.Y.2000); *Piccone v. Bd. of Dir. of Doctors Hosp. of Staten Island, Inc.*, No. 97 Civ. 8182(MBM), 2000 WL 1219391, at *7 (S.D.N.Y. Aug.28, 2000).

**90.** *See* Am. Cpt. ¶¶ 165–66; *see also, e.g., Cofacredit*, 187 F.3d at 245.

**91.** 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

**92.** *Id.* at 506 n. 10, 120 S.Ct. 1608.

**93.** *Blue Cross & Blue Shield*, 113 F.Supp.2d at 385.

**94.** Am. Cpt. ¶ 20.

**95.** *See, e.g., Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (supplemental jurisdiction ordinarily declined where federal claim dismissed before trial); *DiLaura v. Power Auth.*, 982 F.2d 73, 80 (2d Cir.1992) (same).

**96.** The Court has considered plaintiffs' other arguments and found them to be insufficient to warrant any other change.